UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/13/2020
```

------------------------------------X
GENE BRODY,                          :
                                     :
                    Plaintiff,       :
                                     :   19 Civ. 2522 (VM)
        - against -                  :
                                     :   **DECISION AND ORDER**
ISLAND FEDERAL CREDIT UNION et al.,  :
                                     :
                    Defendants.      :
------------------------------------X

**VICTOR MARRERO, United States District Judge.**

Plaintiff Gene Brody ("Brody") is the former President and Chief Executive Officer ("CEO") of Bay Ridge Federal Credit Union ("Bay Ridge"), which merged with defendant Island Federal Credit Union ("Island") in 2018. Brody alleges that, upon consummation of the merger, Island assumed Bay Ridge's contractual obligation to provide Brody with certain health benefits ("Benefits") but has refused to pay for them. (See "Complaint," Dkt. No. 5.) Brody asserts claims against Island for breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, conversion, and violations of New York Labor Law Sections 191(d) and 193. Brody also asserts a claim against Island's President, Bret W. Sears ("Sears"), for intentional interference with a contractual relationship. Brody seeks a declaratory judgment that Island is contractually bound to pay for the Benefits.

1

He also seeks money damages to compensate him for Benefit payments that Island has not made.

Defendants Island and Sears (collectively, "Defendants") filed their answer on May 14, 2019. (See "Answer," Dkt. No. 7.) Defendants deny that Island has any obligation to pay for the Benefits because, among other reasons, the payments are prohibited by the National Credit Union Administration's ("NCUA's") regulations regarding golden parachute payments. See 12 C.F.R. §§ 750.0 - 750.7 (2011). In addition, Island asserts a counterclaim against Brody for unjust enrichment, seeking the return of $86,500 in payments Brody received from Bay Ridge in connection with the termination of his employment. (See "Counterclaim," Dkt. No. 7.) Island alleges that these payments also constitute impermissible golden parachute payments. Brody filed an answer to the Counterclaim on June 4, 2019. (See "Answer to Counterclaim," Dkt. No. 8.)

The Court held an initial conference on August 2, 2019. At that conference, the parties agreed that their dispute turned on certain discrete legal issues. The Court directed the parties to submit letter briefs setting forth their positions on those issues.

Now before the Court are letters submitted by Brody and the Defendants regarding whether the NCUA's golden parachute payment regulations prohibit Island from paying for Brody's

2

Benefits and whether Island's Counterclaim fails as a matter of law. (See "Brody's Letter," Dkt. No. 11; "Defendants' Letter," Dkt. No. 12.)

The Court construes Defendants' Letter as a motion by Defendants to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)").[1] The Court also construes Brody's Letter as a motion to dismiss Defendants' Counterclaim pursuant to Rule 12(b)(6). For the reasons set forth below, the Court **DENIES** both motions.

## I.   BACKGROUND

A.   THE COMPLAINT[2]

Brody served as President and CEO of Bay Ridge from 1987 to 2017, when he stepped down to serve as its part-time Treasurer. A January 1, 2003 employment agreement between Brody and Bay Ridge (the "2003 Agreement") provided that Brody and his spouse would be entitled to the Benefits for the remainder of their lives. The Bay Ridge Board of Directors approved an extension of the 2003 Agreement in 2009. Pursuant to a January 1, 2011 part-time employment agreement with Bay

---

[1] Kapitalforeningen Lægernes Invest. v. United Techs. Corp., 779 F. App'x 69, 70 (2d Cir. 2019) (Mem.) (affirming district court ruling deeming exchange of letters as motion to dismiss).

[2] Except as otherwise noted, the factual background below derives from the Complaint and the facts pleaded therein, which the Court accepts as true for the purposes of ruling on Defendants' motion to dismiss the Complaint. See infra Part II. Except where specifically quoted, no further citation will be made in Part I to the Complaint.

Ridge and amendments to that agreement dated June 1, 2013 and April 5, 2017 (collectively, the "Employment Agreement"), Brody remained entitled to the Benefits. The NCUA repeatedly reviewed the Employment Agreement and deemed it acceptable.

Approximately fifty percent of Bay Ridge's business relied on financing taxicab medallions. As the value of taxi medallions plummeted, Bay Ridge's financial condition declined. In 2017, the NCUA downgraded Bay Ridge's CAMEL rating[3] to 4, thereby identifying Bay Ridge as a credit union in "troubled condition" pursuant to 12 C.F.R. Section 700.2.[4] The NCUA recommended that Bay Ridge merge with another credit union that was not as heavily invested in taxicab medallions.

For purposes of conducting due diligence on a potential merger, Bay Ridge provided Island full access to Bay Ridge's books and records, including the 2003 Agreement and the Employment Agreement. Meanwhile, Brody terminated his employment at Bay Ridge.

By agreement dated October 1, 2018 (the "Merger Agreement"), Bay Ridge merged into Island. The NCUA provided

---

[3] The NCUA uses the CAMEL Rating System to "evaluat[e] the soundness of credit unions" and "identif[y] institutions requiring special supervisory attention or concern." NAT'L CREDIT UNION ADMIN., NCUA LETTER NO. 07-CU-12, EXAMINATION PROGRAM (Dec. 2007). The system's name is an acronym reflecting the elements evaluated: "Capital Adequacy, Asset Quality, Management, Earnings, and Liquidity/Asset-Liability Management." Id. app. a.
[4] "A Federal credit union that has been assigned a 4 or 5 CAMEL composite rating by NCUA" is in "troubled condition." 12 C.F.R. § 700.2.

financial assistance to facilitate the merger. Brody alleges that, through this transaction, Island knowingly assumed Bay Ridge's contractual obligation to pay the cost of Brody's Benefits. Citing the NCUA's golden parachute payment regulations, Island has refused to pay for the Benefits, which cost approximately $2,459 per month. Brody also alleges that Sears has deliberately interfered with Island's performance of its contractual obligation and will receive a bonus or other financial incentive if Island does not pay for the Benefits.

B.   THE COUNTERCLAIM[5]

Brody's employment with Bay Ridge terminated on or about June 30, 2018, after Bay Ridge had fallen into "troubled condition" within the meaning of 12 C.F.R. Section 700.2.  In connection with the termination of his employment, Brody received payments from Bay Ridge in the amount of $86,500.00 (the "Severance Payment"). Bay Ridge did not receive the NCUA's consent before making the Severance Payment. Island alleges that Bay Ridge could not have sought or obtained NCUA approval of the Severance Payment because Brody was substantially responsible for Bay Ridge's troubled condition.

---

[5] Except as otherwise noted, the factual background below derives from the Counterclaim and the facts pleaded therein, which the Court accepts as true for the purposes of ruling on Brody's motion to dismiss the Counterclaim. See infra Part II. Except where specifically quoted, no further citation will be made in Part I to the Counterclaim.

Island alleges that the Severance Payment constitutes a prohibited golden parachute payment because it was made in connection with the termination of Brody's employment, while Bay Ridge was troubled, and without the NCUA's consent.

Pursuant to the Merger Agreement, Island received all of Bay Ridge's assets, rights, and property. Had Bay Ridge not paid Brody the $86,500.00 Severance Payment, that amount would have remained part of the assets Island received pursuant to the Merger Agreement.

C.   <u>THE PARTIES' ARGUMENTS</u>

Brody argues that the Benefits do not constitute golden parachute payments, as that term is defined in 12 C.F.R. Section 750.1 ("Section 750.1"). According to Brody, Section 750.1 defines golden parachute payments as payments made by a troubled credit union, such that payments made by Island -- which is not and has not been troubled at any relevant time -- are not golden parachute payments. Relatedly, Brody argues that Section 750.1 defines golden parachute payments as payments made by a credit union to a current or former institution-affiliated party ("IAP"), but that Brody has never been an IAP of Island. Finally, Brody asserts that, even if the condition of Bay Ridge were relevant, Section 750.1's definition of golden parachute

payments does not include payment obligations that Bay Ridge incurred before it became troubled.

With regard to Island's Counterclaim, Brody notes that 12 C.F.R. Section 750.4 ("Section 750.4") allows credit unions to make golden parachute payments with the NCUA's approval. Brody asserts that Island has requested the NCUA's opinion on the Severance Payment. He argues that Island's claim is premature because Island has not provided evidence that the NCUA declined to approve the Severance Payment. In addition, Brody contends that, even if the Severance Payment was a golden parachute payment, Island would have a claim against Bay Ridge and/or its errors and omissions insurance carrier, not Brody. Finally, Brody asserts that Island knew about Bay Ridge's obligations to Brody when it signed the Merger Agreement and cannot now claw back the payment.

Defendants argue that Brody's claims fail as a matter of law because the Benefits constitute golden parachute payments. Defendants reason that the NCUA intended the regulations to prohibit payment of any unwarranted rewards that would contribute to a credit union's troubled status. Defendants suggest that permitting Island, in the wake of the NCUA-assisted merger, to pay Brody a benefit that Bay Ridge could not lawfully have paid would contravene the policy goals underlying the NCUA regulations.

Defendants further maintain that the Severance Payment was made in violation of the NCUA's golden parachute payment regulations. Island asserts that it is appropriately asserting a claim of unjust enrichment against Brody because he -- not Bay Ridge -- was enriched by the Severance Payment.

## II.   LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Accordingly, a court should not dismiss a complaint for failure to state a claim if the factual allegations "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In contrast, a complaint should be dismissed if the plaintiff has not offered factual allegations sufficient to render the claims facially plausible. See Iqbal, 550 U.S. at 570.

In resolving a Rule 12(b)(6) motion, the Court's task is "to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." In re Initial Pub. Offering Sec. Litig.,

8

383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005) (internal quotation marks omitted), aff'd sub nom. Tenney v. Credit Suisse First Boston Corp., No. 05 Civ. 3430, 2006 WL 1423785 (2d Cir. May 19, 2006); accord In re MF Glob. Holdings Ltd. Sec. Litig., 982 F. Supp. 2d 277, 302 (S.D.N.Y. 2013). In this context, the Court must accept the factual allegations in the complaint as true and draw reasonable inferences in favor of the non-moving party. See Iqbal, 556 U.S. at 678. However, legal conclusions presented in a complaint are not entitled to the same assumption of truth. See id.

## III. **DISCUSSION**

Whether Brody has stated a claim upon which relief can be granted turns on whether the Benefits Brody seeks are prohibited golden parachute payments. Similarly, whether Island has stated a claim turns on whether the Severance Payment was a prohibited golden parachute payment. Resolving the parties' motions thus requires the Court to analyze and interpret the NCUA's golden parachute payment regulations.

A.   THE GOLDEN PARACHUTE PAYMENT REGULATIONS

The NCUA's golden parachute payment regulations, 12 C.F.R. Sections 750.0-750.7, are designed to facilitate the recovery of troubled credit unions. See, e.g., id. § 750.0(b). Among other things, the regulations aim to prevent troubled credit unions from worsening their economic

position by making excessive payments to terminated employees, including those responsible for the credit unions' troubled status. See id. § 750.4. By protecting the finances of troubled federally insured credit unions, the regulations also protect the National Credit Union Share Insurance Fund, which Congress established to insure members' deposits in federally insured credit unions. See 12 U.S.C. §§ 1781(a), 1783(a).

Section 750.1(d)(1) defines "golden parachute payments" as:

> [A]ny payment or any agreement to make any payment in the nature of compensation by any federally insured credit union for the benefit of any current or former IAP[6] pursuant to an obligation of the credit union that:
>
> **(i)** Is contingent on, or by its terms is payable on or after, the termination of the party's primary employment or affiliation with the credit union; and
>
> **(ii)** Is received on or after, or is made in contemplation of, any of the following events:
>
> > . . .
> >
> > **(C)** The federally insured credit union is in troubled condition as defined in § 700.2 of this chapter; . . . and
>
> **(iii)** Is payable to an IAP whose employment by or affiliation with a federally insured credit union is terminated at a time when the federally insured credit union by which the IAP is employed or with which the IAP is affiliated satisfies any of the conditions enumerated in paragraphs (d)(1)(ii)(A) through (E) of

---

[6] As defined by statute, the term IAP includes "any committee member, director, officer, or employee of, or agent for, an insured credit union . . . ." 12 U.S.C. § 1786(r); see also 12 C.F.R. § 750.1(e) (incorporating the statutory definition of IAP).

this section, or in contemplation of any of these conditions.

The definition of golden parachute payments contains several carve-outs. Payments pursuant to certain deferred compensation, benefit, and severance plans, as well as payments made due to death or disability are not golden parachute payments and are therefore permissible. See 12 C.F.R. § 750.1(d)(2)(i)-(vi).[7]

The regulations direct that federally insured credit unions "must not make or agree to make any golden parachute payment, except as permitted by [the regulations]." Id. § 750.2. Thus, the only permissible golden parachute payments are those explicitly allowed. And, the only golden parachute payments explicitly allowed are payments made with NCUA approval. Id. § 750.4(a).

Section 750.4 lists "[p]ermissible golden parachute payments" -- that is, payments that fall within the definition of golden parachute payments but that can nonetheless be made if approved by the NCUA. The regulations describe particular categories of payments that the NCUA may be willing to approve, including, for example, reasonable severance payments conditioned on a merger. Id. § 750.4(a)(3). In addition, Section 750.4(a)(1) more broadly permits a credit

---

[7] Brody does not contend that the payments at issue in this case fall within any of these carve-outs.

union to make any golden parachute payment if the "NCUA . . . determines [it] is permissible . . . ."

As explained in Section 750.4(a)(4), any "federally insured credit union or IAP" can request the NCUA's approval of an otherwise prohibited golden parachute payment. The regulations direct that applicants "must" include certain information when requesting the NCUA's approval. <u>Id.</u> § 750.4(a)(4)(i)-(iv). Among other things, an applicant:

> must demonstrate it does not possess and is not aware of any information, evidence, documents or other materials indicating there is a reasonable basis to believe, at the time the payment is proposed to be made, that . . . [t]he IAP is substantially responsible for . . . the troubled condition . . . of the federally insured credit union.

<u>Id.</u> § 750.4(a)(4)(ii); <u>see</u> <u>also</u> <u>id.</u> § 750.6 (providing additional filing instructions). The regulations also specify the criteria that the NCUA "may consider" in determining whether to approve a golden parachute payment. <u>Id.</u> § 750.4(b). For example, the NCUA may consider "[t]he length of time the IAP was affiliated with the federally insured credit union and the degree to which the proposed payment represents a reasonable payment for services rendered over the period of employment." <u>Id.</u> § 750.4(b)(2).

B.   <u>THE BENEFITS</u>

When interpreting a regulation, the Court must first "carefully consider [its] text, structure, history, and

purpose." <u>Kisor v. Wilkie</u>, 139 S. Ct. 2400, 2415 (2019). If and only if the regulation remains "genuinely ambiguous" after the Court has "exhaust[ed] [these] traditional tools of construction," then the Court may defer to an agency's reasonable interpretation of its rules. <u>Id.</u> at 2414-15. But "not every reasonable agency reading of a genuinely ambiguous rule should receive . . . deference." <u>Id.</u> at 2416. To receive deference, the interpretation must be the agency's "authoritative" or "official position," not an "ad hoc statement." <u>Id.</u> It should also "implicate [the agency's] substantive expertise." <u>Id.</u> at 2417. Finally, the agency's interpretation must reflect its "fair and considered judgment." <u>Id.</u>

When issuing regulations, the Administrative Procedure Act requires agencies "to incorporate in the rules adopted a concise general statement of their basis and purpose." 5 U.S.C. § 553(c). This statement is commonly known as the preamble. Defendants suggest that the Court, when interpreting the golden parachute payment regulations, consider the NCUA's preamble to the rules. <u>See</u> Golden Parachute and Indemnification Payments, 76 Fed. Reg. 30510 (May 26, 2011). The preamble arguably provides information about the regulation's history and purpose which the Court may, under <u>Kisor</u>, consider before deeming the regulation

ambiguous. However, much of the content within the preamble seems more appropriately categorized as the agency's interpretation of its rules. Indeed, in <u>Halo v. Yale Health Plan, Director of Benefits & Records Yale University</u>, 819 F.3d 42, 54-55 (2d Cir. 2016), the Second Circuit reasoned that a preamble reflected an agency's interpretation of its rule and accorded deference to the preamble only after deeming the regulation ambiguous. Consistent with <u>Halo</u>, the Court will not consider the preamble to the rule before making any determination that the regulation is ambiguous.

Accordingly, the Court's analysis begins with a review of the regulatory text. As noted above, Section 750.1(d)(1) defines "golden parachute payments" as:

> [a]ny payment or any agreement to make any payment in the nature of compensation by any federally insured credit union for the benefit of any current or former IAP pursuant to an obligation of the credit union that:
>
> (i) Is contingent on, or by its terms is payable on or after, the termination of the party's primary employment or affiliation with the credit union; and
>
> (ii) Is received on or after, or is made in contemplation of, any of the following events:
>
> . . .

(C) The federally insured credit union is in troubled condition as defined in § 700.2[8] of this chapter; . . . and

(iii) Is payable to an IAP whose employment by or affiliation with a federally insured credit union is terminated at a time when the federally insured credit union by which the IAP is employed or with which the IAP is affiliated satisfies any of the conditions enumerated in paragraphs (d)(1)(ii)(A) through (E) of this section, or in contemplation of any of these conditions.

Here, the Benefits are provided for by "an agreement to make . . . payment[s] in the nature of compensation by [Bay Ridge] for the benefit of" Brody, a "former IAP" of Bay Ridge. 12 C.F.R. § 750.1(d)(1).[9] Brody does not dispute that the Benefits were payable after the termination of his primary employment with Bay Ridge, meeting the criteria of paragraph (d)(1)(i). Nor does Brody contest that his employment by Bay Ridge was terminated at a time when Bay Ridge was in troubled condition, in satisfaction of paragraph (d)(1)(iii). Rather, Brody's argument focuses on the requirements of paragraph (d)(1)(ii)(C) -- the provision regarding the credit union's troubled condition.

First, Brody suggests that the requirements of paragraph (d)(1)(ii)(C) are not met because Bay Ridge agreed to provide him the Benefits long before Bay Ridge was in troubled

---

[8] As noted above, "[a] Federal credit union that has been assigned a 4 or 5 CAMEL composite rating by NCUA" is in "troubled condition." 12 C.F.R. § 700.2.
[9] Brody does not contest that the Benefits are "in the nature of compensation" or that he is a former IAP of Bay Ridge.

condition. That is, Brody asks the Court to construe paragraph (d)(1)(ii)(C) as satisfied only if the "agreement" or "obligation" to pay an IAP, as opposed to the actual payment, "is received on or after, or made in contemplation of" the federally insured credit union's classification as troubled. Id. § 750(d)(1)(ii)(C). But that paragraph's requirements can also be read as satisfied when the agreed-to "*payment* . . . is received on or after . . . [t]he federally insured credit union is in troubled condition . . . ." Id. (emphasis added).

Brody's preferred construction would not reflect ordinary language patterns. When interpreting a statute or regulation, the Court's "job is to interpret the words consistent with their ordinary meaning . . . ." Wisconsin Central Ltd. v. United States, 138 S. Ct. 2067, 2070 (2018); see Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 69 (2012) ("Words are to be understood in their ordinary, everyday meanings -- unless the context indicates that they bear a technical sense."). Brody would have the Court read the term "received" as referring to "obligations" or "agreements" rather than the agreed-to "payments." But, in everyday language, we speak of obligations and agreements as made and incurred, not received.

In addition, adopting Brody's preferred interpretation would hinder achievement of the regulations' goals. It would permit terminated IAPs to extract payments from troubled credit unions so long as the agreements providing for those payments were entered before the credit unions showed signs of decline. IAPs could evade the regulations entirely by proactively contracting for severance, change-in-control, and other post-termination payments. So construed, the regulations would not prevent troubled credit unions from draining their assets through payments to terminated employees, including those responsible for the credit unions' troubled status.

In contrast, interpreting paragraph (d)(1)(ii)(C) as satisfied when there is an "agreement to make payment[s]" that are to be "received on or after . . . [t]he federally insured credit union is in troubled condition" both comports with common language patterns and is consistent with the goals of the regulatory scheme. Id. § 750.1(d)(1)(ii)(C). Under this interpretation, a credit union's agreement to pay an IAP would constitute a golden parachute payment if (1) the payments are received on or after the IAP's termination, (2) the payments are received after the credit union is troubled, and (3) the IAP is terminated when the credit union is troubled. Such a definition would not invite evasion. Nor

17

would it be over-broad given that the regulations explicitly permit certain reasonable plans and enable parties to seek NCUA approval of otherwise prohibited payments. See id. §§ 750.1(d)(2)(i)-(vi), 750.4. Further, this interpretation is consistent with other sections of the regulations, which contemplate that agreements entered by non-troubled credit unions may become unenforceable if the credit union declines financially. For example, Section 750.4(a)(2) explains that, although the NCUA may permit a credit union on the verge of becoming troubled to agree to make a golden parachute payment to attract a hire, the agreement may not be enforceable in the event of insolvency, conservatorship, or liquidation.[10]

Second, Brody argues that the Benefits do not qualify as golden parachute payments because Island, which would be making the payments, has never been troubled. However, Section 750(d)(1) refers not only to federally insured credit unions that make payments but also to those that agree to make payments. Where the drafters of the regulatory language intended to refer exclusively to the federally insured credit

---

[10] Even if the Court deemed the regulatory language ambiguous on this point and proceeded to consider the NCUA's interpretation of the rule as stated in the preamble, the agency's interpretation would support the same conclusion. See Golden Parachute and Indemnification Payments, 76 Fed. Reg. 30510, 30512 (May 26, 2011) ("[The rule's] restrictions are applicable, even in the case of an FICU in a healthy condition that enters into a contract or arrangement for payment of a golden parachute to an IAP. Should that FICU subsequently fall into a troubled condition, the provisions in the rule would apply to the contract and would govern whether or not the payment called for in the contract could be made.").

union that is making the payment, they did so explicitly. <u>See</u> <u>id.</u> § 750.1(d)(1)(ii)(A) (prohibiting payments received on or after "[t]he insolvency of *the federally insured credit union that is making the payment*") (emphasis added). The language of paragraph (d)(1)(ii)(C) is not so limited.

Moreover, as stated by another district court when interpreting nearly identical regulations applicable to banks, "[a]n interpretation according to which an entity's 'troubled' status is destroyed by its acquisition would eviscerate the . . . restrictions by providing a safe harbor to officers and directors seeking to activate their golden parachutes through acquisition by another institution." <u>Hill</u> <u>v. Commerce Bancorp, Inc.</u>, No. 09 Civ. 3685, 2012 WL 694639, at *5 (D.N.J. Mar. 1, 2012), <u>aff'd</u> <u>sub</u> <u>nom.</u> <u>Hill v. TD Bank,</u> <u>NA</u>, 586 F. App'x 874 (3d Cir. 2014).

Nor does the language of 12 C.F.R. Section 750.0, which defines the regulations' scope, counsel in favor of Brody's preferred interpretation. That section explains that "[a] 'golden parachute payment' is generally considered to be any payment to an IAP which is contingent on the termination of that person's employment and is received *when the federally insured credit union making the payment is troubled*." <u>Id.</u> § 750.0(b) (emphasis added). This provision is in tension with Section 750.1(d), as interpreted above. By its very

terms, however, this sentence provides only a description of what golden parachute payments are "generally considered to be." <u>Id.</u> The more specific definition in Section 750(d)(1) must control. <u>See</u> <u>RadLAX Gateway Hotel, LLC v. Amalgamated Bank</u>, 566 U.S. 639, 645 (2012) ("It is a commonplace of statutory construction that the specific governs the general." (quotations and citations omitted)).[11]

Based on the above analysis, the Court concludes that "golden parachute payments," as defined in Section 750.1(d), include post-termination payments made pursuant to an agreement with a federally insured credit union that are received after that credit union is troubled by an IAP who was terminated when the credit union was troubled. This reading applies even if the agreement was finalized before the credit union became troubled and even if, after a merger,

---

[11] Even if the Court deemed the regulatory language ambiguous on this point and proceeded to consider the NCUA's interpretation of the rule as set forth in the preamble, the NCUA's interpretation would support a conclusion that the Benefits are golden parachute payments, even when paid by Island. Specifically, the NCUA rejected a commenter's suggestion that "in the case of unassisted mergers, severance package decisions should be left to the surviving credit union's management to decide" rather than subject to the restrictions of Section 750.4 regarding permissible golden parachute payments. <u>See</u> Golden Parachute and Indemnification Payments, 76 Fed. Reg. at 30514. The implication is that the NCUA interprets the regulations as barring golden parachute payment obligations entered by troubled entities, even if the payment is ultimately made after a merger by a non-troubled surviving entity, unless the NCUA approves the payments. As an official pronouncement of the NCUA issued in response to comments, and drawing on the agency's expertise regarding mergers of troubled credit unions, this statement in the preamble would be entitled to deference. <u>See</u> <u>Kisor</u>, 139 S. Ct. at 2416-17.

the payments would be made by a non-troubled surviving entity. Under this interpretation, and based on the facts alleged in the Complaint, the Benefits are golden parachute payments.[12]

That, however, is not the end of the analysis. As discussed above, the regulations permit any federally insured credit union or IAP to request the NCUA's approval of a golden parachute payment. See Section 750.4(a)(4). To obtain the NCUA's approval of a payment, a party must, among other things, demonstrate that it does not have reason to believe the IAP "is substantially responsible for . . . the troubled condition . . . of the federally insured credit union." Id.

Brody alleges that the NCUA repeatedly reviewed the Employment Agreement and deemed it acceptable. However, the Complaint provides no detail about when the NCUA approved the Employment Agreement in relation to Bay Ridge's financial decline. As discussed above, agreements that are acceptable for a healthy credit union may, in the event the credit union becomes troubled, run afoul of the golden parachute payment regulations. For this reason, that the NCUA once approved Bay Ridge's Employment Agreement with Brody does not mean that

_____

[12] As noted above, Brody does not argue that the payments at issue in this case are excluded from the definition of golden parachute payments according to any of the carve-outs provided by Section 750.1(d)(2)(i)-(vi).

21

payments made pursuant to that agreement, but after Bay Ridge became troubled, still carry NCUA approval.

Nonetheless, that Brody has not yet obtained the NCUA's approval of the Benefits under Section 750.4 does not mean that Brody has not stated a plausible claim to relief. In cases involving similar golden parachute payment regulations, courts have not discharged[13] an entity's obligation to make payments until determining that either (1) the relevant federal and/or state agency declined to approve the payments, see, e.g., Martinez v. Rocky Mtn. Bank, 540 F. App'x 846, 852 (10th Cir. 2013) (discharging a bank's obligation to make a settlement payment where, under golden parachute payment regulations applicable to troubled banks, the Federal Reserve refused to authorize payment), or (2) after conducting a good-faith inquiry, the entity concludes it cannot apply for agency approval because it cannot provide the requisite documentation regarding the plaintiff's conduct, see id. (discussing, with approval, the district court's determination that a bank could not obtain agency approval to make a golden parachute payment where the bank could not make

---

[13] "A party's performance under a contract may be discharged if his performance is rendered impracticable without his fault . . . ." Serdarevic v. Centex Homes, LLC, No. 08 Civ. 5563, 2012 WL 4054161, at *14 (S.D.N.Y. Sept. 5, 2012) (citing Restatement (Second) of Contracts § 261). A government regulation is an event that may render a party's performance impracticable. See id. (citing Restatement (Second) of Contracts § 264).

the required certifications); Hill, 2012 WL 694639, at *9
("[T]he question of whether Defendants are able to make the
requisite certification for the [agency approval] exception
is central to the question of whether or not Defendants can
be said to have breached the Agreement by withholding . . .
payment.").

Island insists that Brody is substantially responsible
for Bay Ridge's troubled condition such that Island cannot
apply for the NCUA's approval of the Benefits. When
considering a motion to dismiss, however, the Court must draw
reasonable inferences in favor of the non-movant. Island's
argument raises a factual question, which the Court cannot
resolve at this juncture.

C.   THE SEVERANCE PAYMENT

Brody argues that Island's Counterclaim -- which seeks
the return of the $86,500 Severance Payment that Bay Ridge
paid Brody -- should not proceed for several reasons. He
asserts that the Severance Payment was not a golden parachute
payment, that Island's claim is premature because the NCUA
has not yet disapproved the payment, that Island's claim
should be asserted against Bay Ridge or its insurance carrier
rather than Brody, and that Island has waived the claim.

First, Brody denies that the Severance Payment is a
golden parachute payment as defined by Section 750.1(d). Yet,

Island's Counterclaim alleges that Bay Ridge made the Severance Payment after Bay Ridge became troubled and in connection with Brody's termination, which occurred after Bay Ridge became troubled. Island also alleges that Bay Ridge made the Severance Payment without NCUA approval. Based on the facts alleged in the Counterclaim, it is not clear that the Severance Payment falls within any of the carve-outs to the golden parachute payment definition. See 12 C.F.R. § 750.1(d)(2)(i)-(vi). Although the Severance Payment could conceivably fall within one of these carve-outs, the Court must draw reasonable inferences in favor of the non-movant when deciding a motion to dismiss. For these reasons, the Court concludes that the Counterclaim's allegations support a plausible inference that the Severance Payment is a golden parachute payment.

Second, Brody asserts that Island's claim is premature because Island has not yet obtained a final decision from the NCUA regarding the permissibility of the Severance Payment. However, the regulatory text does not contemplate retroactive authorization of golden parachute payments. As discussed above, the regulations direct that "a federally insured credit union must not make or agree to make any golden parachute payment except as permitted" by the regulations. Id. § 750.2. This broad prohibition suggests that, unless the

24

conditions of an exception have already been met, the credit union must not make a golden parachute payment. This, in turn, suggests that when the exception at issue requires NCUA approval, approval must be obtained prior to payment. Accord McCarron v. FDIC, 111 F.3d 1089, 1096 (3d Cir. 1997)(concluding "there is no factual or legal basis to permit payment of [the plaintiff]'s severance claims" under golden parachute payment regulations applicable to banks because the plaintiff "never obtained the requisite consent from the FDIC"). Interpreting the regulations as permitting credit unions to make payments with hopes of obtaining NCUA approval later would make little sense in the context of a regulatory scheme designed to protect credit unions with liquidity issues. The Court concludes that the regulations prohibit federally insured credit unions from making golden parachute payments before receiving approval from the NCUA and, where required by the regulations, other relevant authorities.

Brody's argument raises a separate issue -- namely, whether a court can hear a dispute between private parties concerning golden parachute payments before the parties have obtained a final agency determination regarding the permissibility of those payments. Brody has identified no regulatory, statutory, or common law exhaustion requirement that would require Island to obtain a determination from the

NCUA before pursuing a claim against Brody to recover the Severance Payment. In suits between private parties regarding similar golden parachute payment regulations, courts have not required the parties to obtain a final agency determination before proceeding with litigation. See, e.g., Hill, 2012 WL 694639, at *9 (noting private nature of the dispute and rejecting a bank's argument that an IAP should have applied for an exception to golden parachute payment regulations before commencing litigation).[14]

Finally, Brody's remaining arguments do not support dismissal under Rule 12(b)(6). Citing a September 2018 letter from Sears, Brody argues that Island knew about the Severance Payment when it signed the Merger Agreement and therefore cannot seek return of the payment now. When deciding a Rule 12(b)(6) motion, however, the Court cannot consider documents, such as the letter from Sears, that were not attached to or incorporated by reference in the pleadings. See Chambers v. Time Warner Inc., 282 F.3d 147, 154-55 (2d Cir. 2003). The Court must focus its review on Island's pleadings, and the facts alleged therein do not support an

---

[14] This holding does not preclude the parties from agreeing to stay the litigation until the NCUA has issued a final decision regarding the Benefits and Severance Payment in response to a Section 750.4 request from Brody and/or Island. Indeed, such an approach would avoid the possibility of conflicting determinations by this Court and the NCUA and would potentially save the parties the expenses associated with discovery.

inference that Island knew of the Severance Payment at the time of the Merger. Likewise, Brody's argument that Island's claim should be brought against Bay Ridge and/or its insurance carrier, rather than Brody, raises issues that cannot be resolved on the basis of the pleadings.

## IV.  ORDER

Accordingly, for the reasons stated above, it is hereby

**ORDERED** that the motion so deemed by the Court as filed by defendants Island Federal Credit Union and Bret W. Sears (Dkt. No. 12) to dismiss the Complaint of plaintiff Gene Brody (Dkt. No. 5) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is **DENIED**; and it is further

**ORDERED** that the motion so deemed by the Court as filed by plaintiff Gene Brody (Dkt. No. 11) to dismiss the Counterclaim of defendant Island Federal Credit Union (Dkt. No. 7) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is **DENIED.**

**SO ORDERED.**

Dated:    New York, New York
          13 May 2020

                                        _____
                                            Victor Marrero
                                            U.S.D.J.